# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 21-1242V

| | |
|---|---|
| ELIZABETH D'ALESSIO,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: September 30, 2025 |

*Edward M. Kraus*, Law Offices of Chicago Kent, Chicago, IL, for Petitioner.

*Emilie Williams*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On April 19, 2021, Elizabeth D'Alessio filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccination she received on September 27, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). The parties were unable to resolve entitlement or damages, so both were submitted for an SPU Motions Day hearing, held on September 26, 2025.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below (and as orally stated at the Motions Day hearing), **I find that Petitioner is entitled to compensation, and I award damages in the total amount of $79,379.29 (representing $78,000.00 for pain and suffering, plus $1,379.29 for past unreimbursed expenses).**

I. **Relevant Procedural History**

After reviewing the filed records, Respondent indicated a willingness to engage in litigative risk settlement discussions. *See* ECF No. 31. After a period of negotiation, however, the parties reached an impasse on November 20, 2023. ECF No. 38. Respondent filed his Rule 4(c) Report on December 15, 2023, in which he argued that Petitioner had no provide preponderant evidence that the onset of her pain occurred within 48 hours of her vaccination. ECF No. 39. I then directed the parties to brief both the disputed entitlement issues and damages. Petitioner filed her Motion for Ruling on the Record and Brief Regarding Damages on February 9, 2024. ECF No. 41. Respondent filed a response on April 24, 2024 and Petitioner filed a reply on May 17, 2024. ECF No. 42-43.

On August 25, 2025, I proposed that the case be submitted for an expedited hearing on September 26, 2025, at which time I would decide the disputed issues. ECF No. 44. During the hearing, I orally ruled on Petitioner's entitlement to compensation, and then made an oral damages determination. This Decision memorializes those findings and determinations.

II. **Relevant Facts**

Petitioner received a flu vaccine in her left arm on September 27, 2020. Ex. 9 at 6. She recalled that her arm "felt painful and bruised" the following day. 1 at ¶5. In the days after, her pain worsened and she "developed decreased range of motion." *Id*. Petitioner's husband recalled finding her "in bed literally in tears from the pain and exhausted from managing it all day" the day after her vaccination. Ex. 15 at ¶5. For two weeks, she was unable to blow dry her hair, reach across her body, or sleep through the night due to pain. *Id*. After two weeks of "severe and lasting pain," Petitioner determined she should see an orthopedist. *Id*. at ¶7.

Petitioner saw an orthopedist on October 15, 2020 (18 days after vaccination). Ex. 14 at 7. She reported that "her left shoulder pain started after her flu shot on 9-27-2020" and that she had "normal aches afterwards, but it never went away." *Id*. She rated her pain at 6/10 and was diagnosed with rotator cuff tendinitis and subacromial bursitis secondary to flu shot. *Id*. at 7-9. The doctor opined that the shot "likely went a little bit too deep into the subacromial space" and referred Petitioner to physical therapy. *Id*.

Petitioner began physical therapy on November 2, 2020. Ex. 6 at 24. She reported "an increase in shoulder pain that began about 6 weeks ago when she got a flu vaccine." *Id*. On the handwritten intake form, Petitioner wrote that her symptoms started "immediately after [her] flu vaccine" and listed the onset date as 9/27/2020. *Id*. at 27. She stated that her pain was 8/10 in intensity, constant, and interfered with her ADLs. *Id*. at 26. After seven sessions, on November 30, 2020, she indicated that she wanted to get a second opinion and maybe an MRI. *Id.* at 11.

Petitioner saw another orthopedist on December 4, 2020, for a second opinion. Ex. 7 at 66. The record states that "she has been having some pain discomfort in her left shoulder since she had a back in September 27 [sic]." *Id*. She was diagnosed with "subacromial bursitis after previous injection." *Id*. at 70. Home exercises were recommended for 6 weeks, and then an MRI if her symptoms persisted. *Id*.

Three days later, Petitioner called the orthopedist with complaints of right shoulder ear, neck, and tooth pain, along with a sore throat and headache. Ex. 7 at 56. She visited an urgent care facility the same day, was diagnosed with strep pharyngitis, and was prescribed antibiotics and Tramadol. Ex. 5 at 2-3. On December 11, she called the orthopedist to report that the meloxicam had helped her left shoulder pain and the antibiotics helped her sore throat, but she continued to have right-sided neck, tooth, and head pain. Ex. 7 at 56.

On December 10, 2020, Petitioner reported (during a telemedicine visit with her PCP) shoulder impingement beginning in September after a vaccination. Ex. 3 at 11. This record indicates right shoulder pain, not left. *Id.* She reported continued headache (right side). *Id*. Petitioner followed up with her PCP on December 17, 2020 for her headache, left shoulder pain, and neck pain. Ex. 4 at 15. She reported a vaccination in her left arm on September 27th, and "since then had left shoulder pain at the vaccine site." *Id*. She then developed right shoulder and neck pain and headache that was not relieved by Tramadol. *Id.* at 16. On exam, she has very tight levator scapula and upper trapezius muscles and tight cervical muscles. *Id*. at 18. She was diagnosed with chronic tension-type headache and muscle spasms of the neck. *Id*. She was prescribed cyclobenzaprine, encouraged to continue physical therapy, and referred for massage therapy. *Id*.

Petitioner continued with physical therapy during this time. Ex. 6. She reported right shoulder pain (and up into her head) on December 11, 14, and 16, 2020. *Id*. at 14-16. She had a total of 17 PT sessions through December 30, 2020. *Id*. at 21.

On December 18, 2020, Petitioner saw a neurosurgeon. Ex. 11 at 6. She reported that around November she began to have an earache, right facial pain, headache,

3

suboccipital pain, neck pain, pain between the shoulder blades, pain in the left shoulder, and pain in the right shoulder. *Id*. The doctor found "objectively no neurologic deficit" and did not feel it was a surgical case. *Id.* She was referred to an ENT for her ear pain and feeling of right sided jaw pain. *Id*. at 8. He ordered an MRI of the brain and cervical spine "to cover the bases" and referred Petitioner to a neurologist for migraine headaches. *Id*.

Petitioner returned on December 23, 2020 after her MRI to follow-up. Ex. 11 at 3. She repeated her symptoms and stated that "these all started after the flu injection in the left." *Id*. Her MRI showed mild disc bulge at C3-4, C4-5, and C5-6. *Id*. at 4. No surgery was recommended, but an epidural steroid injection was discussed for her neck pain. *Id*. at 5.

Petitioner saw a second neurologist on January 8, 2021. Ex. 10 at 53. She reported her September vaccination and her left arm pain. *Id*. She noted that in December she began having right-sided neck pain, which progressed to "shooting pain into the jaw and back of head." *Id*. She was diagnosed with tendinitis of the left shoulder, migraine headaches, and cervical myofascial pain syndrome. *Id*. at 55. She was prescribed a Medrol dosepak and gabapentin. *Id*. Petitioner stated that the medications "gave [her] the first relief from the pain [she] had been experiencing since receiving the flu vaccine." Ex. 1 at ¶18. She stated that her left shoulder pain was still present, but her head and neck pain were "significantly improved." *Id*.

On February 8, 2021, Petitioner called her orthopedist and reported that she had regained most her of range of motion, but that she still had "quite a bit of pain." Ex. 7 at 48. She reported having seen a neurologist for a "related issue." *Id*. A left shoulder MRI was ordered and completed on February 11, 2021. *Id*.; Ex. 2 at 4. The MRI revealed mild bursitis, a partial tear of the teres minor tendon, mild biceps tendinosis, and osteoarthritic changes at the AC joint. Ex. 2 at 4.

On February 18, 2021, Petitioner's orthopedist administered a cortisone injection to her left shoulder. Ex. 7 at 12. He recommended that she continue a home exercise program. *Id*. She followed up with the orthopedist on April 1, 2021 reporting that the injection did not provide significant relief. Ex. 12 at 32. She expressed frustration with her "difficulty getting back to doing her regular activities." *Id*. Petitioner asked if her shoulder problem could be from her flu shot and was told that it "depend[ed] on the location the injection was given. She is quite thin[3] and it is possible to get into the subdeltoid space if the injection was given slightly more posteriorly." *Id.* at 35. He advised that she should experience improvement with time. *Id*. He thought it might be worth repeating her MRI in the future to check for improvement in the teres minor tear. *Id.*

---

[3] Petitioner's records indicate that she is 5 feet tall and about 100 pounds.

4

Petitioner returned two months later with continued but improved pain. Ex. 12 at 9. She stated that the constant pain had abated, but she was still unable to sleep on her left side and her pain radiated down her arm. *Id*. The doctor re-reviewed the MRI and concluded that it supported the conclusion of a high-grade partial tear or significant inflammatory reaction locally to the teres minor. *Id*. at 12. He explained how the flu vaccine could cause significant inflammation and strain to the tendon. *Id*. He said it could take "significant time" to resolve and recommended another MRI in 6 months if there was no improvement. *Id.* He stated that depending on the outcome, he would possibly recommend surgery or PRP injections. *Id*.

Petitioner did not seek further treatment for her left shoulder pain, but states that as of more than three years post-vaccination, her pain is "generally tolerable at rest," but "flares with activity." Mot. At 6. She continues to have difficulty sleeping on her left side and avoids activities that require using her left arm. *Id*. She suffers from anxiety about aggravating her symptoms. *Id.*

### III. Legal Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly

recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

### I.  Prior SIRVA Compensation Within SPU[4]

#### A.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[5] In only 270 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[6] As I have previously

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[6] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than

8

stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[7]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[9] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[10]

---

instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[10] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr.

9

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## IV. Findings of Fact and Ruling on Entitlement

### I. Onset

Respondent argues that "Petitioner's most contemporaneous medical records fail to demonstrate that the onset of her alleged shoulder pain was within 48 hours of her flu vaccination." Resp. at 8. In support, he points to Petitioner's description of "'normal aches' after her flu shot which never went away." *Id*. Further, although Respondent

---

Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs*., 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

acknowledges that Petitioner and her husband filed statements supporting onset, he argues that this evidence does not overcome the medical records. *Id*.

However, there is support in the record that Petitioner experienced pain immediately after her vaccination. At her first appointment for treatment, Petitioner reported that her "left shoulder pain started after her flu shot on 9-27-2020." Ex. 14 at 7. She was more specific on her intake form for physical therapy just over one month after her vaccination on which she wrote that her symptoms started "immediately after [her] flu vaccine" and listed the onset date as the date of vaccination. Ex. 6 at 27. Although some of the medical records use language like "after" or "since" her vaccination, Petitioner's affidavit provides additional detail that does not contradict the record evidence – that her arm "felt painful and bruised" the day after vaccination. Ex. 1 at ¶5. Petitioner's husband's declaration also corroborates Table onset – as he stated that he recalled finding her "in bed literally in tears from the pain and exhausted from managing it all day" the day after her vaccination. Ex. 15 at ¶5.

Accordingly, I find there is preponderant evidence to establish that the onset of Petitioner's pain occurred within 48 hours of vaccination.

## II. Other Requirements for Entitlement

Other than the argument regarding onset, Respondent has not contested Petitioner's proof on the remaining elements of a Table SIVRA. In light of Respondent's position and the evidence of record, I find that Petitioner has provided preponderant evidence to establish that she suffered a Table SIRVA injury. However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received an influenza vaccine on September 27, 2020 in Aurora, IL. Ex. 9 at 3, 6; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. *See* Petition at ¶7; Section 11(c)(1)(E) (lack of prior civil award). Finally, Petitioner's medical records reveal that she suffered the residual effects of her vaccine injury for more than six months, and Respondent does not argue otherwise. *See e.g.*, Ex. 12 at 9, 32; Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### V.   Compensation to be Awarded

#### I.   Pain and Suffering

When determining the appropriate amount of compensation for a petitioner's pain and suffering, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

There is no dispute that Petitioner was aware of her injury, treatment, and experiences throughout the course of her injury. Thus, my analysis principally involves the duration and severity of her injury. The records reflect that Petitioner suffered a moderate SIRVA injury. She sought treatment within 18 days of her vaccination, complained of high levels of pain in the acute phase, was prescribed oral medications for pain, received one cortisone injection, and completed 17 sessions of physical therapy over approximately eight months of treatment. Ex. 6; Ex. 7 at 12; Ex. 10 at 55; Ex. 14 at 7. Petitioner described some ongoing pain and range of motion deficits after the conclusion of her active treatment. Mot. at 6.

Both parties citied prior SIRVA cases in support of their proposed pain and suffering awards. Although Respondent's cases establish a range up to $60,000.00 in pain and suffering, during argument Respondent proposed an award no larger than $55,000.00. The cases cited by Respondent were mostly factually distinguishable from the instant case.

Petitioner cited two cases that are particularly helpful. Mot. at 20-21. In *Coluccio v. Sec'y of Health & Human Servs.*, No. 19-1684V, 2022 WL 17849579 (Fed. Cl. Spec. Mstr. Dec. 15, 2022), the petitioner was awarded $80,000.00 in pain and suffering for a SIRVA injury that required one MRI, oral medications, one cortisone injection, and 19 physical therapy session over approximately 7.5 months of treatment. That petitioner also described high levels of pain during the first two months of treatment. Petitioner's treatment course is demonstrably similar.

Similarly, in *Starnes v. Sec'y of Health of Human Servs.*, No. 20-1514V, 2023 WL 8110730 (Fed. Cl. Spec. Mstr. Oct. 13, 2023), a claimant was awarded $78,000.00 in pain and suffering. That individual sought treatment within one week and reported high levels of pain during the first month after vaccination. *Id.* at *5. She was prescribed oral medications, received one cortisone injection, and attended 16 physical therapy sessions. *Id.* Her treatment spanned 34 months in total, with gaps of about 16 months during that

12

time, which reduced the amount of her award. *Id*. Petitioner, again, experienced a similar treatment course without gaps, indicating that the appropriate award in this case should be similar.

Overall, Petitioner suffered a moderate SIRVA which largely resolved with moderate treatments. Thus, as explained herein and during my oral ruling on September 26, 2025 (which is fully adopted herein), **I find that $78,000.00 represents a fair and appropriate amount of compensation for Petitioner's pain and suffering.**

## II. Actual Unreimbursed Expenses

Petitioner requests **$1,379.29 in past unreimbursed out-of-pocket expenses**. Mot. at 14. Respondent does not dispute this sum, and therefore Petitioner is awarded it without adjustment. Resp. at 9, fn. 2.

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case.

Furthermore, I award Petitioner a lump sum payment of **$79,379.29 (representing $78,000.00 for pain and suffering, plus $1,379.29 for past unreimbursed expenses).** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[11]

    **IT IS SO ORDERED.**                                      **s/Brian H. Corcoran**
                                                                                 Brian H. Corcoran
                                                                                  Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.